***Local Rule 81***

***Local Rules of Civil Procedure of the Western District of New York***

**Index of Documents Filed or Served in the**
**New York State Court Action**

| Exhibit | Document | Date Filed and/or Served |
|---------|----------|--------------------------|
| **A** | Summons & Verified Complaint | August 25, 2021 (filed)<br>October 29, 2021 (received: Todd Baxter) |

EXHIBIT A

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2821021

Book    Page    CIVIL

Return To:
ELLIOT DOLBY-SHIELDS
192 Lexington Avenue, Suite 802
New York, NY 10016

No. Pages: 26

Instrument: EFILING INDEX NUMBER

Control #:        202108250182
Index #:          E2021007882

Date: 08/25/2021

Armstrong, Joy E.

Time: 9:33:25 AM

The City of Rochester
Baxter, Todd

| | | |
|---|---|---|
| State Fee Index Number | $165.00 | |
| County Fee Index Number | $26.00 | |
| State Fee Cultural Education | $14.25 | |
| State Fee Records | $4.75 | Employee: CW |
| Management | | |
| | | |
| Total Fees Paid: | $210.00 | |

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE**

JOY ELIZABETH ARMSTRONG,

Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity, "JOHN
DOE POLICE OFFICERS 1-200" (names and number of
whom are unknown at present), TODD BAXTER,
"RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names
and number of whom are unknown at present), and other
unidentified members of the Rochester Police Department
and Monroe County Sheriff's Office,

Defendants.

**SUMMONS**

Index No.:

The basis of venue is:
Location of the incident

Plaintiff designates Monroe
County as the place of trial.

**To the above named Defendants:**

**You are hereby summoned** to answer the complaint in this action, and to serve a copy of your
answer, or, if the complaint is not served with this summons, to serve a notice of appearance on
the Plaintiff's attorneys within twenty days after the service of this summons, exclusive of the day
of service, where service is made by delivery upon you personally within the state, or, within 30
days after completion of service where service is made in any other manner. In case of your failure
to appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

DATED: New York, New York
          August 25, 2021

Yours, etc.,

ROTH & ROTH, LLP.
ELLIOT SHIELDS, ESQ.
Attorney for Plaintiff
192 Lexington Ave, Suite 802
New York, New York 10016
(212) 245-1020

EASTON THOMPSON
KASPEREK SHIFFRIN LLP
Donald Thompson
16 West Main Street, Suite 243

Rochester, New York 14614
Ph: (585) 423-8290


TO:
CITY OF ROCHESTER
CORPORATION COUNSEL
30 Church Street
Rochester, New York 14614

COUNTY OF MONROE
Monroe County Law Department
307 County Office Building
39 W. Main St.
Rochester, NY 14614

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

| | |
|---|---|
| JOY ELIZABETH ARMSTRONG,<br><br>                             Plaintiff,<br><br>               -against-<br><br>THE CITY OF ROCHESTER, a municipal entity, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,<br><br>                         Defendants. | INDEX NO.:<br><br>**VERIFIED COMPLAINT**<br>**[JURY TRIAL DEMANDED]** |

Plaintiff, by their attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

I.    **PARTIES**

1.    Plaintiff, JOY ELIZABETH ARMSTRONG (they / them), is a resident of the City of Syracuse, State of New York.

2.    Defendant, CITY OF ROCHESTER ("CITY"), is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD. ,

3.    Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized police department,

authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.      Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

6.      "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies." BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

### III. JURISDICTION

7.      This action falls within one or more of the exceptions as set forth in CPLR Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having acted in reckless disregard for the safety of others, as well as having performed intentional acts.

8.     Mx. Armstrong sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

9.     Mx. Armstrong filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

10.     The CITY held a 50h hearing on May 18, 2021; the COUNTY waived its 50-h hearing for Mx. Armstrong.

11.     More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

12.     This action is being brought within a year of the event that gives rise to Mx. ARMSTRONG's causes of action under New York State law and Plaintiffs have complied with all of the statutory prerequisites for bringing this action.

## IV. STATEMENT OF FACTS

### A. Facts Common to All Causes of Action

13.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

14.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

15. On September 2-5, 2020, the RPD and MCSO defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

16. On September 4 and 5, 2020, Mx. ARMSTRONG attended protests in Rochester in their capacity as a street medic.

**Friday September 4 to Saturday September 5, 2020**

17. On September 4, 2020, at approximately 10:30 – 10:40 p.m., the John Doe RPD Officers and Richard Roe Sheriff's Deputies kettled and trapped Mx. ARMSTRONG on the Court Street Bridge with hundreds of other protesters.

18. When the John Doe RPD officers issued dispersal orders at approximately 10:43 p.m., Mx. ARMSTRONG was trapped on the bridge with hundreds of other protesters and it was physically impossible to immediately comply with the dispersal order and leave the bridge.

19. Less than 30 seconds after the John Doe RPD officers issued dispersal orders, Mx. ARMSTRONG was attacked by the John Doe RPD Officers and Richard Roe Sheriff's Deputies with large amounts of chemical weapons.

20. Mx. ARMSTRONG was overcome by tear gas and other chemicals from pepper spray and pepper balls deployed by the John Doe RPD Officers and/or Richard Roe Sheriff's Deputies.

21. Thereafter, at approximately 12:00 a.m., the John Doe RPD Officers and Richard Roe Sheriff's Deputies threw a tear gas cannister at Mx. ARMSTRONG, causing them to be engulfed in a cloud of tear gas.

22.     As a result of the chemical weapons Defendants used against them on September 4-5, 2020, Mx. ARMSTRONG sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

23.     Mx. ARMSTRONG also sustained emotional and psychological harm from being attacked by the John Doe RPD officers and Richard Roe Sheriff's Deputies.

**Night of Saturday September 5 to Sunday September 6, 2020**

24.     On the night of Saturday, September 5-6, 2020, Mx. ARMSTRONG participated in the peaceful protest in downtown Rochester.

25.     On September 5, 2020, at approximately 10:20 p.m., the John Doe RPD Officers and Richard Roe Sheriff's Deputies kettled and trapped Mx. ARMSTRONG and hundreds of other protesters in the vicinity of the intersection of Broad Street and Exchange Blvd.

26.     Mx. ARMSTRONG was surrounded by hundreds of other protesters when the John Doe RPD officers issued dispersal orders, knowing that it was physically impossible for Mx. ARMSTRONG and the other protesters to immediately comply and leave the area.

27.     The John Doe RPD Officers and Richard Roe Sheriff's Deputies attacked Mx. ARMSTRONG and the other protesters with chemical weapons, including tear gas and pepper balls.

28.     Thereafter, at approximately 11:45 p.m., in the vicinity of the sidewalk at the intersection of Fitzhugh Street and Church Street, as Mx. ARMSTRONG was helping an injured protester, Mx. ARMSTRONG was assaulted, battered and injured by RPD and/or MSCO officers who seized them, threw them to the ground and struck them in the legs and back with, upon information and belief, fists and or batons.

29.     As a result of being thrown on the ground and struck by RPD officers and/or Sheriff's Deputies, Mx. ARMSTRONG sustained a fractured right patella and torn MCL in the right knee.

30.     As a result of the chemical weapons Defendants used against them on September 5-6, 2020, Mx. ARMSTRONG sustained irritation to their skin, eyes, mouth, nose and lungs and menstrual irregularities.

31.     Mx. ARMSTRONG also sustained pain, bruising and swelling from thrown on the ground and beaten by law enforcement and emotional and psychological harm from being attacked by the John Doe RPD officers and Richard Roe Sheriff's Deputies.

B.  **Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

32.     The violation of Mx. Armstrong's rights is attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar peaceful protests and/or lawful demonstrations.

33.     Similarly, BAXTER has deliberately disregarded the fact that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and instead has defined such lawful First Amendment activities as "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

34.     Since at least 2009, the RPD and MCSO has failed to appropriately train its officers on the proper handling of similar peaceful protests and/or lawful demonstrations.

35.     Upon information and belief, the core training provided by the CITY and BAXTER related to similar peaceful protests and/or lawful demonstrations is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

36.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

37.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 5-6, 2020 specifically.

38.     Upon information and belief, the MFF's training and guidelines treat "disorders" (including peaceful protests and/or lawful demonstrations) as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of "less-than-lethal" and chemical weapons.

39.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Plaintiff.

40.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful peaceful protests and/or lawful demonstrations—only for large-scale civil disorders such as riots.

41.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies, including peaceful protests and/or lawful demonstrations.

42. For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of peaceful protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

43. Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

44. Examples of the RPD's unreasonable and discriminatory use of force at prior peaceful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently

seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground....They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

45. Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing

46. In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

47.     When questioned by public officials after the Daniel Prude protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

48.     In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing peaceful protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

49.     Similarly, prior to 2020, BAXTER had received clear notice that peaceful protests have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

50.     Nevertheless, BAXTER, upon information and belief, took no steps to train his Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

51.     Instead, BAXTER, pursuant to County policy, trains his Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence." Thus, BAXTER, pursuant to County policy, explicitly conflates peaceful demonstrations and/or protests with violent riots.

52.     Upon information and belief, BAXTER has not and does not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, the County's "Hazard Mitigation Plan" states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County." Upon information and belief, Sheriff BAXTER is the official responsible for implementing this portion of the County's Hazard Mitigation Plan, and he trained his Sheriff's Deputies in compliance with said policy.

53.     According to the Hazard Mitigation Plan, peaceful demonstrates are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of BAXTER falsely conflating "peaceful demonstrations" with "acts of violence."

54.     Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not inhibited by law enforcement.

55.     Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations" versus "violent mobs" or riots.

56.     Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus,

upon information and belief, BAXTER trains his Sheriff's Deputies to police peaceful demonstrations or protests in the same manner as they would a violent mob or riot.

57.    Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

58.    In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

59.    BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of Black Lives Matter protesters during peaceful demonstrations.

60.    As a result of the BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

### V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Excessive Force**
***Pursuant to 42 U.S.C. § 1983***

61.    All preceding and subsequent paragraphs are incorporated by reference.

62.    Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th Amendment of the United States Constitution and 42 U.S.C. § 1983.

63.     Defendants used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

64.     It was objectively unreasonable for the John Doe RPD Officers and/or Richard Roe Sheriff's Deputies to use military grade weapons and chemical weapons against Plaintiff, without first having made an individualized determination that it was reasonable to use any force against Plaintiff based on their own individual conduct, instead of any perceived "group conduct."

65.     It was objectively unreasonable for the John Doe RPD Officers and/or Richard Roe Sheriff's Deputies to seize Mx. ARMSTRONG, throw them on the ground, and repeatedly strike them.

66.     The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related RPD policies and/or training.

67.     The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, good and accepted policies and/or training.

68.     As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Plaintiff of federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

69.     The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

70.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### SECOND CLAIM FOR RELIEF
**Assault and Battery**
***Pursuant to New York State Law***

71.     All preceding and subsequent paragraphs are incorporated by reference.

72.     RPD officers and/or Sheriff's Deputies battered Mx. ARMSTRONG by subjecting them to various chemical weapons.

73.     RPD officers and/or Sheriff's Deputies seized Mx. ARMSTRONG, threw them on the ground and repeatedly struck them.

74.     Plaintiff was not threatening the law enforcement officers or any other person at any time herein.

75.     By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff without Plaintiff's consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

76.     The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

77.     The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

78.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

79.     The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

80.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

<u>**THIRD CLAIM FOR RELIEF**</u>
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***

81.     All preceding and subsequent paragraphs are incorporated by reference.

82.     In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

83.     Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

84.     Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

85.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

86.     Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

87.     As a result of the foregoing, Plaintiff suffered injuries and damages.

88.     The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

89.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## FOURTH CLAIM FOR RELIEF
### Failure To Intervene
### *Pursuant to 42 U.S.C. § 1983*

90.     All preceding and subsequent paragraphs are incorporated by reference.

91.     The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of Plaintiff's constitutional rights by the other Defendant RPD officers and/or Sheriff's Deputies.

92.     The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

93.     The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

94.     As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

95.     Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

96.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## FIFTH CLAIM FOR RELIEF
### Negligence

**(Against BAXTER)**

97. All preceding and subsequent paragraphs are incorporated by reference.

98. Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons; or the training they were provided was inadequate.

99. BAXTER had a duty to ensure that his Sheriff's Deputies were properly trained in policing peaceful protests and other large demonstrations, to keep the participants safe promote First Amendment expression.

100. BAXTER knew or should have known that the Hazard Mitigation Plan conflated protests and/or peaceful demonstrations with violent mobs or riots, and that in the absence of proper training, his Sheriff's Deputies would use unreasonable and excessive force against peaceful protesters.

101. BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

102. BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

103. BAXTER breached his duty to keep demonstrators safe, including Plaintiff, by, among other things, training his Sheriff's Deputies to use "less lethal" weapons, including chemical weapons, indiscriminately against protesters.

104.    Mx. Armstrong's injuries were a direct and proximate result BAXTER negligently training his deputies in how to lawfully police First Amendment activities.

105.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-5, 2020, BAXTER was negligent failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

106.    As a result, Mx. Armstrong sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

<u>**SIXTH CLAIM FOR RELIEF**</u>
**Negligence**
**(Against the CITY)**

107.    All preceding and subsequent paragraphs are incorporated by reference.

108.    Defendant CITY was negligent in the training, supervision and discipline of the Defendant RPD officers, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons; or the training they were provided was inadequate.

109.    The CITY had a duty to ensure that RPD officers were properly trained in policing peaceful protests and other large demonstrations, to keep the participants safe promote First Amendment expression.

110.    The CITY knew or should have known that its training was inadequate; that in the past, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of proper training, his RPD officers would use unreasonable and excessive force against peaceful demonstrators.

111.   The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

112.   The CITY breached his duty to keep protesters, including Plaintiff, safe by, among other things, training RPD officers to police peaceful protests and/or demonstrations in the same manner as they would police violent mobs.

113.   The CITY breached its duty to keep protesters, including Plaintiff, safe by, among other things, training RPD officers to use "less lethal" weapons, including chemical weapons, indiscriminately against protesters.

114.   Plaintiff's injuries were a direct and proximate result of the CITY negligently training RPD officers in how to lawfully police First Amendment activities.

115.   Moreover, despite their use of extreme and excessive violence against protesters on September 2-5, 2020, the CITY was negligent failing to supervise or discipline any of RPD officers related to any force used protesters on those nights prior to Plaintiff's injuries. The CITY's negligence was the direct and proximate cause of Plaintiff's injuries.

116.   As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### SEVENTH CLAIM FOR RELIEF
**Negligence**
**(Against the Individual Defendants)**

117.    All preceding and subsequent paragraphs are incorporated by reference.

118.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons

and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries.

119.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

120.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

121.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

122.    The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Mx. Armstrong's serious injuries described herein.

123.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

124.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## EIGHTH CLAIM FOR RELIEF
### Respondeat Superior
### (Against the City)

125.    All preceding and subsequent paragraphs are incorporated by reference.

126.    The RPD officers, and other individuals who joined with them in their wrongful conduct, were, at all times relevant to this Count, were employees and agents of the Defendant

CITY. Each of those defendants and persons was acting within the scope of his or her employment, and their acts and omissions, as alleged above, are therefore directly chargeable to the CITY under the doctrine of *respondeat superior.*

127. As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

**WHEREFORE** and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.  Empanel a jury;

b.  Award compensatory and punitive damages;

c.  The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d.  Such other and further relief as the court may deem just and proper.

Dated: New York, New York	Respectfully Submitted,
August 25, 2021	ROTH & ROTH, LLP

Elliot Dolby Shields
Co-counsel for Plaintiffs
192 Lexington Avenue, Suite 802
New York, New York 10024
(212) 425-1020

Easton Thompson Kasperek Shiffrin LLP
Donald Thompson
Co-counsel for Plaintiffs
16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290

## ATTORNEY'S VERIFICATION

**ELLIOT DOLBY SHIELDS,** an attorney duly admitted to practice before the Courts of

the State of New York, affirms the following to be true under the penalties of perjury:

I am associated with Roth & Roth, LLP, attorneys for the Plaintiff, I have read the annexed

**VERIFIED COMPLAINT** and know the contents thereof, based on the files maintained in my

office, and the same are true to my knowledge, except those matters therein which are stated to be

alleged upon information and belief, and as to those matters I believe them to be true. My belief, as

to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent

information contained in my files.

DATED: New York, New York
        August 25, 2021

_____

ELLIOT DOLBY SHIELDS