**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOY ELIZABETH ARMSTRONG,<br><br>                                    Plaintiff,<br><br>                    -against-<br><br>THE CITY OF ROCHESTER, HENRY FAVOR, NASER ZENELOVIC, RAYMOND DEARCOP, RALPH MONTINARELLI, JOSEPH MORABITO, SAMUEL LUCYSHYN, RICHARD CASTRICHINI JR., "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,<br><br>                                    Defendants. | 21-CV-6717 (FPG) (MWP)<br><br>**SECOND AMENDED COMPLAINT**<br>**[JURY TRIAL DEMANDED]** |

Plaintiff, by their attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.        **PARTIES**

1.        Plaintiff, JOY ELIZABETH ARMSTRONG (they / them), is a resident of the City of Syracuse, State of New York.

2.        Defendant, CITY OF ROCHESTER ("CITY"), is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

3.        Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant

1

CITY maintains the City of Rochester Police Department, a duly authorized police department, authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.     Defendant HENRY C. FAVOR ("FAVOR") was, at all times relevant herein, Commander of the Special Operations Division ("SOD") of the RPD. In that role, he oversaw the Mobile Field Force ("MFF"). In his capacity as Commander of the SOD, he was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant FAVOR was responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

5.     Defendant NASER ZENELOVIC ("ZENELOVIC"), was, at all times relevant herein, a Captain with the RPD. Defendant Zenelovic is sued in his individual capacity. Zenelovic was one of the Incident Commanders on September 4, 2020.

6.     Defendant RAYMOND W. DEARCOP ("DEARCOP") is the Commander of the Special Operations Section ("SOS") of the RPD. At all relevant times herein, he was a Captain with the RPD assigned to the SOD. On September 4, 2020, DEARCOP was one of the Incident Commanders on on the scene. On September 5, 2020, DEARCOP was the Deputy Incident Commander on the scene. As commander of the SOS, he oversaw the MFF and all its personnel and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant DEARCOP was responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

7.      Defendant RALPH MONTINARELLI ("MONTINARELLI"), at all relevant times herein, was a Lieutenant assigned to the SOC and the Tactical Unit ("TACT") of the RPD. Montinarelli was one of the Incident Commanders on September 4, 2020. Montinarelli was the Field Force Commander on September 5, 2020, where he oversaw all Mobile Field Force members on the ground. Defendant RALPH MONTINARELLI is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Montinarelli is sued in his individual capacity.

8.      Defendant JOSEPH MORABITO is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Morabito is sued in his individual capacity. Morabito was the Incident Commander on September 5, 2020.

9.      Defendant SAMUEL LUCYSHYN is or was at all relevant times a Lieutenant with the RPD and acting within the scope of his employment and under color of law. At all relevant times herein, LUCYSHYN was the Grenadier Team Leader. The Grenadier Team is a component of the MFF, comprised of selected members who are trained to deploy chemical munitions, and to utilize other crowd dispersal technology and techniques. As Grenadier Team Leader, Defendant LUCYSHYN oversaw the Grenadier Team and was responsible for all Grenadier Team matters, including the selection, ordering, purchase, and inventory of all chemical weapons and/or "less lethal" weapons used by the Grenadier Team; and the appointment, training, supervision and conduct of Grenadier Team personnel. In addition, Defendant LUCYSHYN was responsible for enforcing the rules of the Grenadier Team and ensuring that Grenadier Team personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

10.     Defendant RICHARD CASTRICHINI JR. is or was at all relevant times an RPD officer and acting within the scope of his employment and under color of law. CASTRICHINI was a member of the Mobile Field Force ("MFF") and on September 5, 2020, he was assigned to the "Gray Team". Defendant CASTRICHINI is sued in his individual capacity.

11.     "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

12.     Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

13.     Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

14.     "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff

BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies." BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II.  JURISDICTION, VENUE AND CONDITIONS PRECEDENT

15.    This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

16.    The Court has pendent jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367.

17.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the judicial district where the claims arose and in which the Defendants conduct business.

18.    Mx. Armstrong filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

19.    The CITY held a 50h hearing on May 18, 2021; the COUNTY waived its 50-h hearing for Mx. Armstrong.

20.    More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

21.    This action is being brought within a year of the event that gives rise to Mx. ARMSTRONG's causes of action under New York State law and Plaintiffs have complied with all of the statutory prerequisites for bringing this action.

## III.  STATEMENT OF FACTS

### A.  Facts Common to All Causes of Action

22.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

23.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

24.     On September 2-5, 2020, the RPD and MCSO defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

25.     On September 4 and 5, 2020, Mx. ARMSTRONG attended protests in Rochester in their capacity as a street medic.

**Friday September 4 to Saturday September 5, 2020**

26.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" hundreds of protesters, including Plaintiff, spray them with tear gas, and attack them with pepper balls – a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama.

27.     RPD officers first escorted peaceful protesters along Court Street from Martin Luther King Jr. Memorial Park towards the Public Safety Building ("PSB") and directed them onto

the Court Street Bridge. But when protesters reached the other side, law enforcement stopped them with metal barricades.

28.     Defendants had closed the street to vehicular and pedestrian traffic.

29.     Defendants inhibited the freedom of movement of Plaintiff and other protesters by stopping them with metal barricades and trapping them on the bridge.

30.     After hundreds of protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." However, the dispersal orders were not clearly communicated, and the protesters towards the back of the bridge near South Avenue could not hear the dispersal orders. Moreover, there was nowhere for the protesters in the front near the police barricades to go.

31.     When the John Doe RPD officers issued dispersal orders at approximately 10:43 p.m., Mx. ARMSTRONG was trapped on the bridge with hundreds of other protesters and it was physically impossible to immediately comply with the dispersal order and leave the bridge.

32.     Less than 30 seconds after the John Doe RPD officers issued dispersal orders, Mx. ARMSTRONG was attacked by the John Doe RPD Officers and Richard Roe Sheriff's Deputies with large amounts of chemical weapons.

33.     Mx. ARMSTRONG was overcome by tear gas and other chemicals from pepper spray and pepper balls deployed by the John Doe RPD Officers and/or Richard Roe Sheriff's Deputies.

34.     Thereafter, at approximately 12:00 a.m., the John Doe RPD Officers and Richard Roe Sheriff's Deputies threw a tear gas cannister at Mx. ARMSTRONG, causing them to be engulfed in a cloud of tear gas.

35.     Defendant LUCYSHYN chose the various chemical weapons that were used against Mx. ARMSTRONG and other protesters on September 4-5, 2020.

36.     Defendant LUCYSHYN chose various chemical weapons that contained harmful chemicals such as lead, which is known to cause birth defects and reproductive harms.

37.     In fact, many of the various chemical weapons that Defendant LUCYSHYN chose to use against Mx. Armstrong and other protesters on September 5, 2020 had a warning directly on the product and on the product's website that states:

> **"WARNING: This product can expose you to chemicals including Lead Salts and Hexavalent Chromium, which are known to the State of California to cause cancer, and Lead Salts, which are known to the State of California to cause birth defects or other reproductive harm. For more information go to www.P65Warnings.ca.gov.**

38.     As a result of the chemical weapons Defendants used against them on September 4-5, 2020, Mx. ARMSTRONG sustained irritation to her skin, eyes, mouth, nose and lungs, menstrual irregularities and harm to their reproductive system.

39.     Mx. ARMSTRONG also sustained emotional and psychological harm from being attacked by the John Doe RPD officers and Richard Roe Sheriff's Deputies.

40.     As a result of the chemical weapons and being shot with pepper balls, and being threatened and terrorized by Defendants, Plaintiff suffered physical and emotional injuries and other damages, including menstrual irregularities.

41.    The Incident Commanders, who made all tactical decisions regarding the response to the protesters on September 4-5, 2020 were, upon information and belief, Defendants FAVOR, ZENELOVIC, MONTINARELLI and DEARCOP.

42.    Additionally, LUCYSHYN was on the ground on September 4-5, 2020, directing the police response and carrying out orders provided by the Incident Commanders over the radio. Lucyshyn also directed the use and deployment of various chemical weapons, including weapons known to contain chemicals that cause harm to the reproductive system and birth defects.

43.    Upon information and belief, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, along with other policymakers for the City and RPD, developed the protest response plan for the night of September 4-5, 2020.

44.    Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP, along with other City policymakers, devised the plan to erect metal barricades on the West Side of the Court Street Bridge, knowing this would cause protesters to become trapped on the bridge with no method to safely escape or comply with police orders to disperse.

45.    Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered officers to deploy pepperballs and CS gas at protesters who were trapped on the bridge, and then to charge at protesters and push and strike them with batons.

46.    After the protest on the night of September 4-5, 2020, an After Action Report was caused to be drafted by the Incident commanders. Upon information and belief, the After Action Report was reviewed, approved and ratified by the Incident Commanders and other policymakers for the City, including the Police Chief.

**Night of Saturday September 5 to Sunday September 6, 2020**

47.     On the night of Saturday, September 5-6, 2020, Mx. ARMSTRONG participated in the peaceful protest in downtown Rochester.

48.     On September 5, 2020, at approximately 10:20 p.m., the John Doe RPD Officers and Richard Roe Sheriff's Deputies kettled and trapped Mx. ARMSTRONG and hundreds of other protesters in the vicinity of the intersection of Broad Street and Exchange Blvd.

49.     Defendants escorted protesters as they marched on the City's streets, until they approached the intersection of Broad Street and Exchange Boulevard.

50.     Defendants had closed the intersection of Broad Street and Exchange Boulevard to vehicular and pedestrian traffic prior to Plaintiff and other protesters approaching that intersection.

51.     When Plaintiff and other protesters approached the intersection of Broad Street and Exchange Boulevard, they were met with an overwhelming presence of RPD officers, Sheriff's deputies and State Police in full riot gear with military grade weapons—including a bearcat tank—and police dogs.

52.     Plaintiff and the other protesters were stopped at the intersection of Broad Street and Exchange Blvd. by Defendants, who prohibited their freedom of movement at the intersection.

53.     Mx. ARMSTRONG was surrounded by hundreds of other protesters when the John Doe RPD officers issued dispersal orders, knowing that it was physically impossible for Mx. ARMSTRONG and the other protesters to immediately comply and leave the area.

54.     The John Doe RPD Officers and Richard Roe Sheriff's Deputies attacked Mx. ARMSTRONG and the other protesters with chemical weapons, including tear gas and pepper balls.

55.     On September 5 at approximately 10:30 p.m. at the intersection of Broad Street and Exchange Blvd, RPD officers and/or Sheriff's Deputies subjected to large amounts of tear gas and other chemical weapons and attacked Plaintiff with the LRAD and flash bang grenades.

56.     The use of C.S. gas and other chemical weapons by the Grenadier team was specifically approved by Defendant MORABITO.

57.     Thereafter, at approximately 11:53 p.m., on the sidewalk on State Street, near the vicinity of the intersection with Church Street (to the South of the intersection and on the opposite side of the street from Dunkin Donuts), as Mx. ARMSTRONG was helping an injured protester, Mx. ARMSTRONG was assaulted by RPD Officer RICHARD CASTRICHINI JR.

58.     Specifically, at approximately 11:53 p.m., the RPD Mobile Field Force was in a formation called a Crossbow on State Street, south of the intersection with Church Street, when the RPD Command, including but not limited to MORABITO, ordered CASTRICHINI and other Mobile Field Force officers to rush at Plaintiff, who was present on the sidewalk, and other protesters who were on the sidewalks and street in the vicinity of State Street and Church Street.

59.     CASTRICHINI suddenly rushed at Plaintiff, without warning, and shoved her in the chest with his baton, throwing Plaintiff onto the ground.

60.     CASTRICHINI lacked cause or justification for violently shoving Plaintiff with his baton, propelling Plaintiff to the ground.

61.     No reasonable officer would have believed they had cause or justification to violently shove Plaintiff to the ground.

62.     As a result of being struck and/or shoved by CASTRICHINI with his baton and propelled onto the ground, Mx. ARMSTRONG sustained a fractured right patella and torn MCL in the right knee.

63.     As the Grenadier Team Leader, Defendant LUCYSHYN chose the various chemical weapons that were used against Mx. ARMSTRONG and other protesters on September 5-6, 2020.

64.     Defendant LUCYSHYN chose various chemical weapons that contained toxic chemicals such as lead, which is known to cause birth defects and reproductive harms.

65.     In fact, many of the various products that Defendant LUCYSHYN chose to use against Mx. Armstrong and other protesters on September 5, 2020 had a warning directly on the product and on the product's website that states:

> "**WARNING: This product can expose you to chemicals including Lead Salts and Hexavalent Chromium, which are known to the State of California to cause cancer, and Lead Salts, which are known to the State of California to cause birth defects or other reproductive harm. For more information go to www.P65Warnings.ca.gov.**

66.     The Incident Commanders, who made all tactical decisions regarding the response to the protesters on September 5-6, 2020 were, upon information and belief, Defendants FAVOR, MORABIDO, MONTINARELLI and DEARCOP.

67.     Additionally, LUCYSHYN was on the ground on September 5-6, 2020, directing the police response and carrying out orders provided by the Incident Commanders over the radio. Lucyshyn also directed the use and deployment of various chemical weapons, including weapons known to contain chemicals that cause harm to the reproductive system and birth defects.

68.     Upon information and belief, FAVOR, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, along with other policymakers for the City and RPD, developed the protest response plan for the night of September 5-6, 2020.

69.     Upon information and belief, FAVOR, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, devised the plan to erect metal barricades at the intersection of Exchange Boulevard and Broad Street, knowing this would cause protesters to become trapped at this intersection with no method to safely escape or comply with police orders to disperse.

70.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered officers to deploy pepperballs, CS gas, and other chemical weapons and "less lethal" weapons at protesters who were trapped at the intersection of Broad Street and Exchange Boulevard, and then to charge at protesters and push and strike them with batons.

71.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered the use of tactics, chemical weapons and other "less lethal" weapons against "groups" of protesters in an indiscriminate manner.

72.     After the protest on the night of September 5-6, 2020, an After Action Report was caused to be drafted by the Incident commanders. Upon information and belief, the After Action Report was reviewed, approved and ratified by the Incident Commanders and other policymakers for the City, including the Police Chief.

73.     As a result of the chemical weapons Defendants used against them on September 5-6, 2020, Mx. ARMSTRONG sustained irritation to their skin, eyes, mouth, nose and lungs, menstrual irregularities and harm to their reproductive system.

74.     Mx. ARMSTRONG also sustained pain, bruising and swelling from thrown on the ground and beaten by law enforcement and emotional and psychological harm from being attacked by the John Doe RPD officers and Richard Roe Sheriff's Deputies.

B.  **Coordination Between the City and RPD, and County and BAXTER, to Develop the Unlawful Protest Response Plan**.

75.     For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. The City and RPD coordinated with the County, BAXTER and MSCSO to develop a joint protest response plan.

76.     From the very beginning, policymaking officials of the City and RPD (including former Chief Singletary), and the County and MSCO (including BAXTER), zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism; policymaking officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

77.     This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

78.     Upon information and belief, during those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using dangerous chemical weapons against protesters; using overwhelming amounts of

chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

79.   Prior to the protests that erupted on September 2, 2020, former RPD Chief La'Ron Singletary and Monroe County Sheriff TODD BAXTER, along with other final policymakers with respect to police practices for the City and County, designed and orchestrated the unlawful protest response plan.

80.   RPD officers and MCSO deputies were ordered by Singletary, BAXTER and other final policymakers to suppress the protests: RPD officers and MCSO deputies were given military-grade equipment and authority to spray and gas indiscriminately, aim high with pepper balls and KIPS, and inflict pain as a deterrent.

81.   The multi-agency response to the September 2020 Black Lives Matter protests was managed under a Unified Command (UC) system between the CITY and the RPD; the COUNTY, MCSO and BAXTER.

82.   On the nights of September 5-6, 2020, policymaking officials for the RPD and CITY, along with BAXTER and other policymaking officials of the MCSO and County, were present in the Command Posts and were overseeing and directing the response of the RPD officers and Sheriff's Deputies to the protesters—including the use of specific tactics and weapons.

83.   The natural, inevitable result of the City and County policies is exactly what transpired: officers complying with official policies on the use of the "less lethal" force caused serious injuries peaceful protestors and others who were there to document and record the law enforcement response. Therefore, there was a "direct causal link" between the offending policies

and the constitutional deprivations Mx. ARMSTRONG suffered; in other words, Mx. ARMSTRONG 'S particular injuries were incurred *because* of the execution of the unlawful City and County policies.

84.     Over the Course of three nights, from September 2-6, 2020, RPD officers and Sheriff's Deputies implemented the unlawful protest response plan (PRP) and responded to peaceful protests with extreme violence:

- The City and County Defendants created a Unified Command (UC) to establish a common set of objectives, strategies, and a single "protest response plan" (PRP). The objective of this coordinated protest response PRP was to create an intimidating, militarized, multi-agency response under a unified command system. Under the response plan, the City and County Defendants trained and instructed RPD officers and Sheriff's Deputies to use force against "groups" of protesters, without first having made an individualized determination that there was a lawful basis to use force against any individual in the group based on their own individual conduct, as opposed to the perceived "group conduct."

- RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists, and at legal observers and others attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters— like MX. ARMSTRONG—often after they blocked off all escape routes to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons capable of causing significant blunt trauma, including bone fractures, lacerations, internal bleeding, and death. One protester struck in the face by a canister required stitches inside and outside of her mouth and has permanent facial scarring.

- Over those three nights, RPD officers discharged 6,100 pepper balls at people protesting the Departments' aggressive and racist practices. RPD officers shot protesters with 40mm direct-impact foam bullets—kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended and unintended targets. RPD officers fired CTS 40 mm munitions during the protest. The CTS website cautions that shots to the head, neck, thorax, heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration. RPD officers also used flash bang grenades, deployed sonic weapons, and struck protesters with batons.

- RPD officers and Sheriff's Deputies fired the "less lethal" munitions indiscriminately into crowds of protesters, including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

- RPD Chief La'Ron Singletary, a policymaker for the CITY on police practices, designed and implemented the protest response plan on behalf of the CITY, and implemented the unlawful policies that required RPD officers to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists, legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

- Monroe County Sheriff TODD BAXTER, a policymaker for the COUNTY on police practices, designed and implemented the protest response plan on behalf of the COUNTY, and implemented the unlawful policies that required Sheriff's Deputies to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists, legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

85.     Moreover, City officials effectively ratified the RPD's violent response. While hundreds of peaceful protesters, many of them Black and brown, were injured by RPD's violent response to the demonstrations, the Department condoned its officers' actions. Former RPD Chief Singletary praised RPD officers, saying publicly that they "showed restraint" when many peaceful demonstrators, including elected officials, were shot in the head with pepper balls, pepper sprayed, and worse. RPD Deputy Chief Mark Mura declared that the tactics RPD officers used were "tactful, *per policy and training*, and appropriate for the situation at hand." Former Mayor Lovely Warren also praised RPD officers: "[Y]ou made us very, very proud."

86.     The widespread use of pepper spray, pepper-balls, tear gas, and other types of "less lethal" weapons belies any claim that individual officers were acting on their own rather than implementing a preconceived municipal plan.

C.   **The Effects of Teargas and Other Chemical Weapons Was Known Prior to the September 2020 Protests**.

17

87. After George Floyd was murdered on May 25, 2020, racial justice protests took place in cities across the county. Numerous police departments responded by using teargas and other chemical weapons against protesters.

88. Immediately, protesters across the country reported that exposure to teargas and other chemical weapons caused menstrual irregularities.

89. Throughout the summer of 2020, media outlets nationwide reported that protesters who were exposed to teargas and other chemical weapons were experiencing irregularities with their menstrual cycle. *See, e.g.*, Katie C. Reilly, *Police tear gas George Floyd protests despite proof it's dangerous. Time for a ban*, NBC News (June 11, 2020), https://www.nbcnews.com/think/opinion/police-tear-gas-george-floyd-protests-despite-proof-it-s-ncna1229516 (noting that, tear gas "has been linked to miscarriages"); Jennifer Gerson, *Doctors Explain What You Should Know About Tear Gas & Your Period,* Bustle (June 17, 2020), https://www.bustle.com/p/can-tear-gas-affect-your-period-doctors-explain-what-to-know-22987529; Nicole Wetsman, *There isn't enough research to know if tear gas causes early periods: it's dangerous regardless*, The Verge (June 22, 2020), https://www.theverge.com/2020/6/22/21295159/tear-gas-menstural-cycle-miscarriage-period-protests; Dhruvi Chauhan, Paula Kibuka Musoke, and Goleen Samari, *Using tear gas on protesters perpetuates patterns of reproductive harm*, The Hill (June 26, 2020), https://thehill.com/opinion/healthcare/504699-using-tear-gas-on-protesters-perpetuates-patterns-of-reproductive-harm; Cecilia Nowell, *Protesters Say Tear Gas Caused Them to Get Their Period Multiple Times in a Month*, Teen Vogue (July 2, 2020), https://www.teenvogue.com/story/protestors-say-tear-gas-caused-early-menstruation; Alexandria Herr, Can tear gas mess with your period? Grist (Jul. 17, 2020), https://grist.org/justice/can-tear-

gas-mess-with-your-period/; Rebecca Ellis, *'It's like they're testing it on us': Portland protesters say tear gas has caused irregularities with their periods*, OPB (July 29, 2020), https://www.opb.org/article/2020/07/29/tear-gas-period-menstrual-cycle-portland/. *Police are using tear gas, but lack of study and oversight raises health concerns,* Associated Press (Aug. 6, 2020), https://www.oregonlive.com/news/2020/08/police-are-using-tear-gas-but-lack-of-study-and-oversight-raises-health-concerns.html; Abe Asher, *Irregular Periods and Horrible Headaches: How Tear Gas Is Making Portland Sick*, VICE (Aug. 14, 2020), https://www.vice.com/en/article/4ay5mn/an-endless-barrage-of-tear-gas-is-making-portland-sick; Catherine Ryan Gregory, *Tear Gaslighting: Is There a Link Between Protesting and Messed Up Periods?* Marie Claire (Aug. 21, 2020), https://www.marieclaire.com/health-fitness/a33648135/tear-gas-effects-reproductive-system/.

90.     Thus, for months prior to the September 2020 protests, Defendants had clear notice that the use of teargas and other chemical weapons causes damage to women's reproductive health, including menstrual irregularities and miscarriages.

91.     Additionally, many of the various chemical weapons used against Mx. Armstrong and other protesters on September 4 and 5, 2020 had a warning directly on the product and on the product's website that states:

> **"WARNING: This product can expose you to chemicals including Lead Salts and Hexavalent Chromium, which are known to the State of California to cause cancer, and Lead Salts, which are known to the State of California to cause birth defects or other reproductive harm. For more information go to www.P65Warnings.ca.gov.**

92.     Nevertheless, Defendants ignored these warnings and made tear gas, pepper balls and other chemical weapons the centerpiece of their coordinated protest response plan.

93.     Pursuant to policy, on the night of September 4-5 and 5-6, 2020, RPD officers and/or Sheriff's Deputies attacked Ms. ARMSTRONG with chemical weapons. As a result, upon information and belief, Ms. ARMSTRONG suffered severe menstrual irregularities and other harms to their reproductive system.

D.  **Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

94.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

95.     Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

96.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

97.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the nights of September 4-5, 2020 specifically.

98.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus

on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

99.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Mx. ARMSTRONG.

100.    Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

101.    However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

102.    For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

103.    Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

104.    Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers

pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one

weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

105.    Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

106.    In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

107.    When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

108.    The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.   However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

109.    The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on use for force. There appears to have been no consideration given to whether such force would be

excessive to secure compliance with traffic laws or enforce violations or misdemeanors against nonviolent protestors.

110.    In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

   E.   **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

111.    Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

112.    The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

113.    The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

114.    Instead, the COUNTY and BAXTER, trained Sheriff's Deputies to respond to First Amendment assemblies pursuant to the County's Hazard Mitigation Plan, which defines a "civil disturbance" as both "peaceful demonstrations or acts of violence."

115.    Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

116.    Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

117.    Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

118.    According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy.

119.     Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

120.     Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

121.     The Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos."

122.     Upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

123.     Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

124.     In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

26

125.   BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

126.   As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Municipal Liability

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights***
**(Against the City)**

127.   All preceding and subsequent paragraphs are incorporated by reference.

128.   All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

129.   As a result of the foregoing, Plaintiff suffered injuries and damages.

### SECOND CLAIM FOR RELIEF
### Municipal Liability and Supervisory Liability

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and
Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests***
**(Against the COUNTY and BAXTER)**

130.   All preceding and subsequent paragraphs are incorporated by reference.

131.   All of the wrongful acts or omissions complained of herein against Plaintiff and
other protesters were carried out by the individually named and unnamed MCSO employees and/or
Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY
and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO,
including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO
that are so widespread and pervasive as to constitute de facto policies accepted, encouraged,
condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER,
and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate
indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the
United States Constitution, as evidenced by their failures, and the failures of the other
policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's
Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described
herein.

132.   BAXTER, through his conduct in developing and implementing the COUNTY's
unlawful policies for responding to the protests, caused the violation of Plaintiff's rights at the
September 2020 protests.

133.   As a result of the foregoing, Plaintiff suffered injuries and damages.

**<u>THIRD CLAIM FOR RELIEF</u>**
**Excessive Force**
***Pursuant to 42 U.S.C. § 1983***
**(Against CASTRICHINI, John Does, and Richard Roes)**

134.    All preceding and subsequent paragraphs are incorporated by reference.

135.    Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th Amendment of the United States Constitution and 42 U.S.C. § 1983.

136.    Defendants used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

137.    It was objectively unreasonable for the John Doe RPD Officers and/or Richard Roe Sheriff's Deputies to use military grade weapons and chemical weapons against Plaintiff, without first having made an individualized determination that it was reasonable to use any force against Plaintiff based on their own individual conduct, instead of any perceived "group conduct."

138.    It was objectively unreasonable for the John Doe RPD Officers and/or Richard Roe Sheriff's Deputies to seize Mx. ARMSTRONG, throw them on the ground, and repeatedly strike them.

139.    The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related RPD policies and/or training.

140.    The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, good and accepted policies and/or training.

141.    As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Plaintiff of federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

142.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

143.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

**FOURTH CLAIM FOR RELIEF**
**Assault and Battery**
*Pursuant to New York State Law*
**(Against CASTRICHINI, John Does, Richard Roes and City of Rochester)**

144.    All preceding and subsequent paragraphs are incorporated by reference.

145.    RPD officers and/or Sheriff's Deputies battered Mx. ARMSTRONG by subjecting them to various chemical weapons.

146.    RPD officers and/or Sheriff's Deputies seized Mx. ARMSTRONG, threw them on the ground and repeatedly struck them.

147.    Plaintiff was not threatening the law enforcement officers or any other person at any time herein.

148.    By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff without Plaintiff's consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

149.    The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

150.    The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

151.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

152.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

153.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### FIFTH CLAIM FOR RELIEF
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***
**(Against all Defendants)**

154.    All preceding and subsequent paragraphs are incorporated by reference.

155.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

156.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

157.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

158.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

159.     Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

160.     As a result of the foregoing, Plaintiff suffered injuries and damages.

161.     The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

162.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

<u>**SIXTH CLAIM FOR RELIEF**</u>
**Failure To Intervene**
***Pursuant to 42 U.S.C. § 1983***
**(Against all Individual Defendants)**

163.     All preceding and subsequent paragraphs are incorporated by reference.

164.     The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of Plaintiff's constitutional rights by the other Defendant RPD officers and/or Sheriff's Deputies.

165.     The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

166.     The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

167.     As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

168.     Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

169.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## SEVENTH CLAIM FOR RELIEF
### Negligent Training, Supervision and Discipline
### (Against BAXTER)

170.     All preceding and subsequent paragraphs are incorporated by reference.

171.     Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

172.     Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

173.     Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

174.     BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

175.     As a result of the foregoing, Plaintiff suffered injuries and damages

176.     As a result, Mx. Armstrong sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## EIGHTH CLAIM FOR RELIEF
### Negligent Planning of the Protest Response
### (Against BAXTER)

177.     All preceding and subsequent paragraphs are incorporated by reference.

178.    Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

179.    BAXTER had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under the First Amendment to the United States Constitution, and Article I, section 8 of the New York State Constitution, were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

180.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

181.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that violated the rights to free speech, expression and to assemble.

182.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that conflated peaceful protests and demonstrations with violent mobs and riots; thus, BAXTER knew or should have known that in the absence of a proper protest response plan, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators, like Plaintiff.

183.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

184.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

185.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

186.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

187.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

188.    Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

189.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**NINTH CLAIM FOR RELIEF**
**Negligent Planning of the Protest Response**

**(Against the CITY)**

190.    All preceding and subsequent paragraphs are incorporated by reference.

191.    The CITY and RPD were negligent in planning the response to the protests.

192.    The CITY had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

193.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

194.    The CITY and RPD breached its duty to Plaintiff and other protesters by failing to implement any plan whatsoever for how to ensure that RPD officers protected and promoted protesters rights to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

195.    The City and RPD breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested

in the training of RPD officers that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

196.   The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that affirmatively violated protesters' rights to free speech, expression and to assemble under First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

197.   The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

198.   The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause protesters rights to free speech, expression and to assemble under the First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

199.   The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators and falsely arrest them.

200.   The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects—as same had been

widely reported around the county in the months prior to the RPD's use of said chemical weapons in September 2020.

201.   The CITY breached his duty to keep demonstrators safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

202.   The CITY breached its duty to keep demonstrators safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

203.   The CITY breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

204.   The CITY breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

205.   The CITY breached his duty to keep demonstrators safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

206.   Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

207.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## TENTH CLAIM FOR RELIEF
### *Supervisory Liability Under 42 U.S.C. § 1983*
**(Against FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI, MORABITO and LUCYSHYN)**

208.    All preceding and subsequent paragraphs are incorporated by reference.

209.    As Commander of the SOD of the RPD, FAVOR oversaw the MFF, and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel.

210.    FAVOR personally caused Plaintiff's constitutional injuries by failing to properly train MFF personnel, as described herein; and by failing to appropriately supervise and discipline MFF personnel who violated departmental policy (such as by shooting pepper balls at head level), who engaged in unlawful conduct and/or who violated the rights of Plaintiffs and other protesters.

211.    Favor, Zenelovic, Dearcop and Montinarelli were the Incident Commanders on September 4-5, 2020. In that role, they oversaw the RPD and the joint protest response on that night, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

212.    Morabito, Dearcop and Montinarelli were the Incident Commanders on September 4-5, 2020. In that role, they oversaw the RPD and the joint protest response on that night, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

213.    Lucyshyn was the Grenadier Team Leader at all times relevant herein. In that role, he chose the various chemical weapons and other "less-lethal" weapons that were used against Plaintiffs and other protesters in September and October, 2020. He also oversaw the training, supervision and discipline of all Grenadier Team members. As such, he was personally involved in causing the injuries sustained by Plaintiffs, as described herein.

214.    Because of the foregoing, Plaintiff sustained, *inter alia*, physical pain, permanent physical injuries, mental injuries, emotional distress, embarrassment, humiliation, loss of standing in the community, adverse employment consequences, loss of liberty, and deprivation of his common law and constitutional rights, and seeks compensation in an amount to be determined at trial.

215.    As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

216.    Defendants committed the foregoing violations of Plaintiffs' rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiffs' constitutional rights or to the effect of such misconduct upon Plaintiffs' constitutional rights.

217.    By reason of the foregoing, the Defendants are liable to Plaintiffs, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages

**WHEREFORE** and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.    Empanel a jury;

b.    Award compensatory and punitive damages;

c.    The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City or County;

d.    Award costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

e.    Such other and further relief as the court may deem just and proper.

Dated: New York, New York          Respectfully Submitted,
       September 21, 2023            ROTH & ROTH, LLP


                          ~//s//~
              _____
              Elliot Dolby Shields
              Co-counsel for Plaintiffs
              192 Lexington Avenue, Suite 802
              New York, New York 10024
              (212) 425-1020

              Easton Thompson Kasperek Shiffrin LLP
              Donald Thompson
              Co-counsel for Plaintiffs
              16 West Main Street, Suite 243
              Rochester, New York 14614
              Ph: (585) 423-8290